## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **PROCESS PIPE FABRICATORS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-CV-0869-CVE-SAJ** |
| | ) | **(Consolidated 05-CV-0304-CVE-FHM)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are the United States' Second Motion for Summary Judgment and
Opening Brief in Support (Dkt. # 85) and Plaintiff's Second Motion for Summary Judgment and
Opening Brief in Support (Dkt. # 86). Both parties requested leave of court to file a second motion
for summary judgment to submit additional evidentiary materials regarding the value of invoices
seized by the IRS and the reasonableness of the government's collection efforts. After reviewing
the motions for summary judgment, the Court finds that there are no genuine issues of material fact,
and it can rule on the merits of plaintiff's tax refund claim without submitting the case to a jury.

## I.

Process Pipe Fabricators, Inc. ("Process Pipe") brought this tax refund claim against the
United States to recover an alleged overpayment of federal employment taxes. The Court has
previously entered three opinions and orders ruling on dispositive motions, but some background
is necessary to address the issues raised by the parties in their second motions for summary
judgment. Process Pipe is an Oklahoma corporation that assembles gas transmission units for
offshore and onshore gas transmission facilities. Beginning in 1992, Process Pipe developed a
business relationship with GasTech Engineering Corporation ("GasTech"), an engineering firm

based in Tulsa, Oklahoma. From 1992 to 1994, Process Pipe entered subcontracts with GasTech in which Process Pipe agreed to fabricate transmission equipment for GasTech's clients. The parties agreed that the clients would pay GasTech directly and GasTech agreed to reimburse Process Pipe for its work.

However, the agreement did not operate as the parties intended, and GasTech frequently neglected to pay Process Pipe in a timely manner. Process Pipe's financial situation deteriorated to the point that it was forced in 1994 to seek Chapter 11 bankruptcy protection from its creditors, largely because Process Pipe was unable to collect invoices owed by GasTech. In addition, Process Pipe did not pay federal employment taxes from March 31, 1992 to March 21, 1996. By March 1996, Process Pipe owed $354,520 in unpaid employment taxes, interest, and penalties. Even though Process Pipe had had problems collecting payment from GasTech in the past, Process Pipe chose to renew its relationship with GasTech in July 1996. From July 20 to November 11, 1996, Process Pipe submitted six invoices to GasTech totaling $256,641, but GasTech did not pay any part of the outstanding invoices. In 1996, representatives from Process Pipe met with the IRS to discuss payment of Process Pipe's tax liability, and Process Pipe agreed to permit the IRS to seize sufficient accounts receivable to pay its tax deficiency. The IRS seized all 6 invoices to GasTech , and it served GasTech with notices of levy on August 16, 1996, October 23, 1996, and April 15, 1999.

The IRS assigned Judy Schultz to serve as the collections officer for Process Pipe, and she received the file in July 1996. She states that she "spent a great deal of time and effort . . . including multiple attempts to collect monies owed to Process Pipe by GasTech Engineering." Dkt. # 85-6, at 1. Schultz kept a detailed investigation history on IRS Form 2748 recording her efforts to collect Process Pipe's outstanding tax liability. Schultz noted that Process Pipe had over $1 million worth

2

of work in progress at that time and that Process Pipe was paying its management excessive salaries. Id. at 9-10.  She advised Process Pipe to obtain a loan to pay off the tax deficiency, but her notes suggest that Process Pipe was unable to qualify for a loan.  She conducted a thorough analysis of Process Pipe's assets, including accounts receivable.  Process Pipe's attorney stated that the company had "come up with $500,000 in receivables which he will 'give' to [Schultz] to levy - this will satisfy majority of debt."  Id. at 19.  Schultz agreed to send notices of levy for the invoices, but she questioned whether the IRS would be able to collect the tax deficiency with these invoices.  On October 29, 1996, Schultz talked to her supervisor, Ken Harris, who "agreed that if Gastech [sic] has been billed and work has been completed and provided to Gastech [sic] [that] funds are due and we should proceed to suit."  Id. at 23.  However, Schultz was unable to confirm that the work was actually completed and she continued to investigate the matter.

Instead of filing a lawsuit against GasTech, the IRS set up a payment plan in October 1996 with GasTech to begin collection of the outstanding amounts on the seized invoices.  GasTech made an initial payment of $5,000[1] and it agreed to make monthly payments of $750.  Under this payment plan, GasTech paid a total of $38,000 from October 1996 to September 2000.  It is clear that GasTech's payments under this plan constituted only a partial payment of the invoices, but the IRS believed that GasTech would likely file for bankruptcy if the IRS was too aggressive in attempting to enforce its levies against GasTech.  In the summer of 1996, GasTech hired a certified public accountant, Graham Wilson, to assess GasTech's financial situation.  Wilson recommended that

---

[1]      Process Pipe states that it is undisputed that the IRS has no evidence that it credited Process Pipe for the $5,000 payment.  Schultz recorded receipt of the payment on October 29, 1996, and states that is was applied to "0119206."  Dkt. # 85-6 at 23.  It is unclear to what account Schultz is referencing, but there is evidence that the IRS received and processed the check.

GasTech file for bankruptcy protection, because GasTech was insolvent and could not continue operating as it was structured. Dkt. # 85-5, at 1. GasTech's president, Parviz Khosrowyar, wished to avoid bankruptcy and intended to restructure the company's debt outside of bankruptcy. Wilson suggested that GasTech hire Bob Lewis, a debt negotiation specialist, and Neil Tomlins, a bankruptcy attorney, to assist GasTech with restructuring its debt. Lewis contacted vendors and attempted to negotiate down GasTech's debts, while Tomlins created a restructuring plan to address GasTech's inability to obtain credit and to resolve pending lawsuits against GasTech.

GasTech had a $2 million line of credit from Stillwater National Bank ("SNB") but, by 1996, the credit limit was exhausted. This made it difficult for GasTech to obtain funds for day-to-day business expenses, such as payroll, parts, or payments to vendors. Tomlins approached SNB about extending the line of credit beyond $2 million, but SNB refused. However, SNB was willing to negotiate GasTech's existing debt. Tomlins contacted a supplier of equipment to GasTech, Hesham Derazi, and found that Derazi was willing to purchase GasTech's outstanding debt to SNB for $650,000. SNB agreed to accept the $650,000 payment, plus $172,000 from the proceeds of a certificate of deposit used to secure GasTech's debt and $85,000 from GasTech's checking account with SNB, as full satisfaction of the debt. In connection with GasTech's agreement with SNB, American Bank and Trust Co. ("American") agreed to extend GasTech a $1 million line of credit. American's offer was contingent upon satisfaction of three conditions by GasTech: (1) GasTech needed to post sufficient collateral; (2) GasTech's president, Khosrowyar, had to execute a personal guaranty; and (3) GasTech had to settle its existing vendor debt for 30 cents on the dollar. Id. at 2. GasTech was able to negotiate its existing debt of $1,144,729 down to $343,418, but it still faced significant financial problems, including a $300,000 deficit in shareholder equity.

The IRS did not agree to settle Process Pipe's invoices at that time, but continued with its efforts to collect to full amount of the seized invoices. Although a payment plan was in place, it was clear that GasTech's monthly payments of $750 would not satisfy the invoices. According to Process Pipe, it informed the IRS that GasTech had been fully paid for Process Pipe's work by January 14, 1997, but Process Pipe did not have any evidence to support this claim. The IRS investigated whether GasTech was paid by its customers for Process Pipe's work, because GasTech's owner repeatedly denied that GasTech had been paid. One of GasTech's customers, NGPL (Chicago), confirmed that it paid GasTech for Process Pipe's equipment, but the evidence does not specify how much NGPL paid GasTech.

After the IRS' unsuccessful efforts to collect the full amount of the invoices, the United States filed a lawsuit against GasTech, United States v. GasTech Engineering Corp., Case No. 99-CV-0026-JOE (N.D. Okla.) ("GasTech litigation"), alleging that GasTech failed to honor the notices of levy and seeking a judgment for the face value of the invoices. In its amended complaint, the government sought judgment for $229,141 plus interest and penalties from the dates the notices of levy were served on GasTech. In its amended answer, GasTech asserted that "it suffered serious financial and business difficulties during the time period described in the Complaint." Dkt. # 38-18, at 1-4. GasTech also disputed that it owed the full amounts stated on the invoices, because it claimed that Process Pipe's workmanship was substandard. Id.

The court entered summary judgment in favor of the United States and ordered the parties to submit a proposed judgment. The parties disputed the appropriate amount of the judgment but, after further discussion between the parties, the Court entered a judgment against GasTech for $309,112. GasTech appealed the judgment, but the parties settled while the case was on appeal.

5

Given GasTech's uncertain financial condition, counsel for the United States, Andrew T. Pribe, determined that it would be difficult to collect the full amount of the judgment. Pribe was concerned that GasTech would seek bankruptcy protection and the United States would be unable to collect any part of its judgment against GasTech. Dkt. # 60-2, at 1. The parties agreed to a settlement and GasTech dismissed its appeal. The settlement required GasTech to pay $167,000, with an initial installment of $15,000 upon execution of the settlement agreement, followed by monthly payments over the next 72 months. In addition, the United States obtained a subordination agreement from one of GasTech's secured creditors to prioritize its claim in the event that GasTech sought bankruptcy protection.

The parties dispute whether the government's decision to settle its judgment against GasTech was reasonable, which is a central issue in this case. Process Pipe argues that the United States was negligent by failing to collect the invoices immediately after the notices of levy were served on GasTech, and the United States should bear the risk of loss if GasTech were later unable to pay the face value of the invoices. Process Pipe also claims that the government is barred from relitigating the value of the invoices under the doctrines of issue preclusion and judicial estoppel. The United States responds that it engaged in extensive collection efforts to recover the full amount of the invoices. It relies on the expert affidavit of David Payne, a certified public accountant ("CPA"), to support its argument that it actually collected more than the fair market value of the invoices. According to Payne, the fair market value of the invoices in November 1996 was approximately $55,000, or 10 to 25 % of the face value of the invoices. By March 2002, when the United States settled its case against GasTech, the fair market value was approximately $117,000. Based on

Payne's calculations, the United States claims its obtained a result that exceeded any reasonable expectations when it settled the case for $167,000.

Process Pipe states that the IRS should have offered to return the invoices to Process Pipe as soon as it became clear that the IRS would not be able to collect the face value of the invoices. The parties do not dispute that the government never attempted to return the invoices, and Process Pipe claims that this is a fatal flaw in the government's argument that its collection efforts were reasonable.  Relying on GasTech's tax returns, Process Pipe claims that GasTech was making millions of dollars per year, but the IRS permitted GasTech to make monthly payments of $750.[2] It suggests that the IRS was grossly negligent for allowing GasTech to pay other debts while accepting partial payments on Process Pipe's invoices.  Process Pipe also asserts that GasTech was fully paid for Process Pipe's work, and GasTech could have paid the invoices if the government had acted in a timely manner.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.

---

[2]     For example, Process Pipe states that GasTech earned $11,411,404 gross income in 1998, with profits of $2,898,404.  Process Pipe fails to mention that GasTech's net income was actually an operating loss of $14,543 for the tax year.

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

In a previous opinion and order, the Court stated that it would follow Stead v. United States, 419 F.3d 944 (9th Cir. 2005), and notified that parties that the following legal standard would apply to plaintiff's tax refund claim:

> Before a taxpayer is entitled to a credit for property beyond the value obtained by the IRS, the IRS must levy on the property and engage in affirmative acts of negligence

8

> when disposing of the property.  A necessary part of the taxpayer's claim is that it
> must prove the value of the seized asset in the hands of the IRS before the taxpayer
> will be entitled to a credit.

Dkt. # 71, at 4.  Thus, two issues are presented: (1) what was the value of the invoices at the time

the IRS served notices of levy on GasTech; and (2) has the taxpayer shown that the IRS was

affirmatively negligent when it collected less than the full value of the assets.  The parties have

briefed extensively the value of the invoices in the hands of the IRS and the reasonableness of the

government's collection efforts.

### A.

Process Pipe attempts to establish the value of the invoices by relying on issue preclusion,

res judicata, and judicial estoppel.  It claims that the United States is barred from relitigating the

value of the invoices after it obtained a judgment for $309,112 in the GasTech litigation.  Defendant

responds that offensive nonmutual collateral estoppel can not be used to prevent the government

from raising a defense and, even if the Court considers the issue of collateral estoppel, all four

elements of collateral estoppel are not satisfied.  The United States argues that the elements of res

judicata are not present, because plaintiff's claim for a tax refund is not part of the same claim as

in the GasTech litigation.  The United States also asserts that judicial estoppel is inapplicable,

because it has not taken inconsistent positions before two separate courts.

Collateral Estoppel or Issue Preclusion

Process Pipe argues that the government has already obtained a final judgment on the merits

establishing the value of the seized invoices, and it believes the government should not be permitted

to argue that the invoices are worth less that $309,112.  The government argues that nonmutual

collateral estoppel does not apply against the government[3] and, even if the Court considered the applicability of collateral estoppel, the government is not attempting to litigate an issue that has already been determined in a previous case.

Process Pipe claims that the precise issue, the value of the invoices, was conclusively established in the GasTech litigation. "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Dodge v. Cotter, 203 F.3d 1190, 1198 (10th Cir. 2000) (quoting Ashe v. Swenson, 397 U.S. 436, 443 (1970)).  The party raising issue preclusion has the burden to prove four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003).  Issue preclusion bars relitigation of an issue, even if the issue "arises when the party is pursuing or defending against a different claim." Park Lake Resources Ltd. Liability Co. v. United States Dept. of Agriculture, 378 F.3d 1132, 1136 (10th Cir. 2004).  In this case, plaintiff was not a party to GasTech litigation and mutuality of the parties is lacking.  This particular variation on collateral estoppel is called offensive nonmutual collateral estoppel, which prevents a party from relitigating an issue that it has "previously litigated unsuccessfully in an action with another party." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4 (1979).

---

[3]   Plaintiff did not file a reply in support of its motion for summary judgment, and did not address the government's argument that offensive nonmutual collateral estoppel can not be applied against the United States.

In <u>United States v. Mendoza</u>, 464 U.S. 154 (1984), the Supreme Court severely limited the circumstances when offensive nonmutual collateral estoppel can be used to prevent the United States from relitigating a particular issue.  In <u>Mendoza</u>, a Filipino national petitioned the Immigration and Naturalization Services ("INS") for citizenship under a statute that was repealed in 1946. <u>Id</u>. at 156. The federal district court granted the petition without reaching the merits of the case, because it found that the United States previously and unsuccessfully litigated the same issue in another federal district court.  The Supreme Court reversed the district court's decision and held that the doctrine of nonmutual offensive collateral estoppel can not be applied against the United States. <u>Id</u>. at 158. Recognizing that the government is not in the same position as an ordinary civil litigant, the Supreme Court stated that it is beneficial to require the government to litigate multiple cases involving the same legal issue.  Litigation against the government frequently requires the resolution of important constitutional issues and offensive nonmutual collateral estoppel, if applied against the government, has the strong potential to freeze the development of constitutional law.  The Supreme Court was clear that collateral estoppel can be applied against the government only when the same parties are involved in two separate lawsuits. <u>Id</u>. at 163.

Under the rule stated in <u>Mendoza</u>, Process Pipe can not rely on collateral estoppel to prevent the government from relitigating the value of the seized invoices.  It is clear that Process Pipe is attempting to prevent relitigation of an issue, the value of the seized invoices, when it was not a party to the government's lawsuit against GasTech.  Mutuality between the parties in this case and the GasTech litigation is lacking, and Process Pipe must rely on offensive nonmutual collateral estoppel as recognized by the Supreme Court in <u>Parklane Hosiery</u>.  While offensive nonmutual collateral estoppel can be used in some cases, <u>Mendoza</u> prevents the Court from applying this

doctrine against the government.  Even if the Court were to consider the merits of plaintiff's argument, it is clear that plaintiff can not satisfy all four elements of collateral estoppel.[4]  Therefore, issue preclusion does not apply, and this doctrine does not prevent the United States from litigating the value of the assets in this case.

Res Judicata

In its response to the government's motion for summary judgment, plaintiff argues that the United States is bound by the judgment in the GasTech litigation under the doctrine of res judicata, and the value of the invoices can not be relitigated in this case.  The United States responds that res judicata does not apply, because there is no privity between the parties in the two lawsuits and the lawsuits are based on separate causes of action.

Res judicata, also known as claim preclusion, "generally applies when there is a final judgment on the merits which precludes the parties or their privies from relitigating the issues that were decided or issues that could have been raised in the earlier action."  Driver Music Co., Inc.v. Commercial Union Ins. Co., 94 F.3d 1428, 1435 (10th Cir. 1996) (quoting Frandsen v. Westinghouse Corp., 46 F.3d 975, 978 (10th Cir. 1995)).  This doctrine bars claims that were actually litigated or could have been litigated in the initial action.  SIL-FLO, Inc., SFHC, Inc., 917 F.2d 1507, 1520 (10th Cir. 1990).  As the party seeking to apply res judicata, plaintiff bears the

---

[4]     In particular, plaintiff has not shown that the two cases involve an identical legal issue.  The issue in this case, the value of the seized invoices in the hands of the IRS, is materially different from any issue raised in the GasTech litigation.  In the GasTech litigation, the court determined whether GasTech "is liable to [Process Pipe] for work performed by PPI for GEC and evidenced by certain invoices."  GasTech, 99-CV-0026-JOE, Dkt. # 37, at 1.  In this case, the Court must determine the value of the invoices in the hands of the IRS.  These issues are distinguishable, because the amount owed by GasTech to Process Pipe is not necessarily the same as the value of the invoices in the possession of the IRS.  Therefore, issue preclusion would not apply under the facts of this case.

burden to prove that each of the following four elements are met: "(1) the prior suit must have ended with a judgment on the merits; (2) the parties must be identical or in privity; (3) the suit must be based on the same cause of action; and (4) the plaintiff must have had a full and fair opportunity to litigate the claim in the prior suit." Nwosun v. General Mill Restaurants, Inc., 124 F.3d 1255, 1257 (10th Cir. 1997). The Tenth Circuit has adopted the transactional approach stated in the Restatement (Second) of Judgments § 24 to determine what constitutes a single cause of action. Petromanagement Corp. v. Acme-Thomas Joint Venture, 835 F.2d 1329, 1335 (10th Cir. 1988).

Process Pipe argues that "[p]rivity exists here between the United States of America and Plaintiff on the issue litigated in the Gastech [sic] Litigation, i.e., the value of the GasTech accounts receivable when GasTech failed to honor the levy." Dkt. # 88, at 5. It appears that Process Pipe has confused issue preclusion with claim preclusion, and this argument does not support a finding that privity exists between Process Pipe and the United States. The Tenth Circuit has not recognized any specific definition of privity that applies to all cases. Century Indem. Co. v. Hanover Ins. Co., 417 F.3d 1156, 1160 (10th Cir. 2005). However, the Tenth Circuit has stated that "privity requires, at a minimum, a substantial identity between the issues in controversy and showing that the parties in the two actions are really and substantially in interest the same." St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1174 (10th Cir. 1979). The Court does not look solely at the similarity of the legal issues, as Process Pipe has suggested, but the Court must also consider the interests of the parties in both lawsuits to determine if privity exists. See Century Indem. Co., 417 F.3d at 1160. Although some of the same issues may arise in this case as were previously litigated in the GasTech litigation, there is no evidence that the two cases are substantially similar. Process Pipe's interest in this case, obtaining a tax refund, is not similar to the government's interest when

it attempted to collect on a tax levy against GasTech.  Therefore, plaintiff has not shown that it has privity with the United States concerning the GasTech litigation, and the first element of res judicata is not satisfied.

It is also clear that this case is based on a separate cause of action from the GasTech litigation, and the third element of res judicata is not present.  Under the transactional approach adopted by the Tenth Circuit, the Court must determine whether plaintiff's claim arises from the same cause of action as that stated by the United States in the GasTech litigation.  Yapp v. Excel Corp., 186 F.3d 1222, 1227 (10th Cir. 1999).  "What constitutes a 'transaction' or a 'series' is to be determined pragmatically considering whether the facts are related in time, space, origin, or motivation, and whether they form a convenient trial unit."  King v. Union Oil Co. of California, 117 F.3d 443, 445 (10th Cir. 1997).  Plaintiff's claim for a tax refund is not part of the same transaction as the United States' claim against GasTech for failure to honor a tax levy, if for no other reason than plaintiff could not have filed this lawsuit until the GasTech litigation was completed.  Much of plaintiff's claim for a tax refund is based on events that occurred after the GasTech litigation was resolved, and the two cases could not have been litigated at the same time.  See Driver Music Co, 94 F.3d at 1435 (cases not part of the same transaction for purposes of res judicata when "each [case] sounds in a different legal theory and depends for its resolution on different operative facts").  The GasTech litigation and this lawsuit are based on different facts and arise under distinct legal theories, and they do not form the same cause of action.  Therefore, res judicata is not applicable.

Judicial Estoppel

Plaintiff argues that the government should be judicially estopped from relitigating the value of the seized invoices in this case.[5]  Defendant responds that none of the elements of judicial estoppel is satisfied, and the government should not be estopped from asserting that the invoices were worth less than their face value.  Defendant argues that it has not adopted inconsistent positions in two separate judicial proceedings and, even if the value of the assets was raised in prior litigation, the court was not required to determine this issue in the GasTech litigation.  The government also states that Process Pipe has not shown that it will be prejudiced if the government is permitted to argue that Process Pipe is not entitled to a tax credit for the full value of the invoices.

Judicial estoppel is an equitable defense that prevents a party from adopting a contrary position in a subsequent judicial proceeding when it would prejudice the opposing party.  Kaiser v. Bowlen, 455 F.3d 1197, 1203 (10th Cir. 2006).  Until recently, the Tenth Circuit had not formally adopted the doctrine of judicial estoppel.  However, based on the Supreme Court's decision in New Hampshire v. Maine, 532 U.S. 742 (2001), the Tenth Circuit held that it was compelled to recognize judicial estoppel.  Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005).  In Johnson, the Tenth Circuit created a three-part test for analyzing claims of judicial estoppel:

> "First, a party's later position must be 'clearly inconsistent' with its earlier position."
> [New Hampshire, 532 U.S. at 750.]  Moreover, the position to be estopped must
> generally be one of fact rather than of law or legal theory. *Lowery v. Stovall*, 92 F.3d
> 219, 224 (4th Cir.1996). Second, "whether the party has succeeded in persuading a
> court to accept that party's earlier position, so that judicial acceptance of an
> inconsistent position in a later proceeding would create 'the perception that either the
> first or the second court was misled.' " *New Hampshire*, 532 U.S. at 750, 121 S.Ct.

---

[5]     Plaintiff merely states that judicial estoppel should be applied and cites the general principles of this doctrine.  However, plaintiff makes no attempt to apply this doctrine to the facts of this case.

1808 (citation omitted). The requirement that a previous court has accepted the prior inconsistent factual position "ensures that judicial estoppel is applied in the narrowest of circumstances." *Lowery*, 92 F.3d at 224. Third, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751, 121 S.Ct. 1808.

405 F.3d at 1069. These three elements are not absolute requirements, but factors in guiding a court's application of the doctrine of judicial estoppel.

Plaintiff has not shown that the government has taken conflicting positions before different courts, and judicial estoppel does not apply. In the GasTech litigation, the government was attempting to obtain a judgment on a debt owed to Process Pipe, in order to satisfy Process Pipe's tax obligations. The value of the invoices was not directly at issue but, rather, the primary issue litigated was Process Pipe's entitlement to collect any money for the work it performed for GasTech's clients.[6] In this case, Process Pipe claims that it overpaid its taxes because the government did not collect the full value of the seized invoices. Process Pipe has not shown how the government has taken a position that is "'clearly inconsistent' with its earlier position" in the GasTech litigation. The Court is hesitant to invoke the doctrine of judicial estoppel to prevent the government from defending against an essential element of plaintiff's tax refund claim, especially when plaintiff has not clearly shown that the United States has taken a contradictory position before two different courts. Therefore, the Court finds no basis to preclude the government from litigating the value of the invoices in this case, and the Court will examine the summary judgment record to

---

[6] GasTech defended against the government's claims by asserting that Process Pipe's work was unsatisfactory, and that GasTech was unable to collect the full amount owed. See GasTech, 99-CV-0026-JOE, Dkt. # 9.

16

determine if the undisputed facts clearly establish the value of the invoices at the time the United

States settled its claim against GasTech.

**B.**

The parties dispute the value of the seized invoices.  The government argues that the fair

market value of the invoices was well below their face value, and it has produced an expert affidavit

in support of this argument.[7]  Process Pipe claims that if the Court does not find that the government

is precluded from litigating the value of the invoices, the Court should find that there are genuine

issues of material fact preventing summary judgment in favor of the government, specifically:

> (1)    plaintiff had historically collected in full from GasTech and is confident that it could
> have done so in this case;

> (2)    millions of dollars passed through GasTech's hands in the years of and after the
> seizures (which was used to pay other creditors); [and]

> (3)    GasTech had been paid in full for plaintiff's work long before the United States of
> American finally filed a collection suit.

Dkt. # 88, at 7.  The Court has concluded that the government is not precluded from litigating the

value of the invoices in this proceeding.  Process Pipe does not argue that it can establish the value

of the assets based on the undisputed facts, but it simply states that summary judgment is

---

[7]     Process Pipe claims that the expert affidavit is inadmissible for two reasons: (1) defendant's
expert lacks the necessary qualification under Fed. R. Evid. 702 and Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993); and (2) the Court should not consider this
evidence because plaintiff could not afford to depose defendant's expert. Dkt. # 88, at 2 n.2.
However, plaintiff offers no support for either argument.  With or without an objection from
plaintiff, the Court must fulfill its role as gatekeeper before considering expert testimony
under Daubert, but plaintiff does not show that defendant's experts are unqualified.  See
Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999).  As to plaintiff's second
argument, it offers no support for the proposition that financial inability to depose an expert
somehow prevents the opposing party from relying on expert evidence, and the Court finds
this argument to be meritless.

inappropriate.  The government has provided substantial evidence supporting its claim that the invoices were worth less than face value, and it asserts that the three facts stated by Process Pipe are not material to the Court's decision.

The government has convincingly shown that GasTech was financially unstable when the IRS seized the six invoices in 1996.  GasTech hired an accountant, Wilson, for the specific purpose of helping GasTech pay its creditors without filing for bankruptcy.  When Wilson investigated GasTech's financial situation, he "found that GasTech Engineering was unable to pay their [sic] debts as they became due.  In other words, I found that GasTech was insolvent and could not continue operating as structured."  Dkt. # 85-5, at 1.  GasTech settled most of its outstanding debt with suppliers for 30 cents on the dollar and many of GasTech's smaller creditors elected to compromise their debts entirely.  Two major creditors of GasTech accepted substantially less than was owed.  GasTech owed Bush Compressors over $500,000, and Bush Compressors accepted less than 30 cents on the dollar to satisfy its debt.  GasTech's largest creditor, SNB, settled GasTech's outstanding debt of $1,631,649 for $650,000.  Based on GasTech's records from May 1997, GasTech settled an additional $1,144,729 of vendor debt for $343,418.  In summary, there is substantial evidence showing that creditors were not obtaining the full amount owed by GasTech and, in fact, they were willing to accept much less to satisfy GasTech's debts.

18

The government has provided the expert affidavit of David Payne, a CPA with at least 25 years of experience.[8]   The United States asked Payne to provide an expert opinion on the two following issues:

- The value of the accounts receivable (Accounts) due to Process Pipe Fabricators, Inc. from GasTech Engineering Corporation at the time that the United States acquired them in November of 1996; [and]

- The value of the Accounts evidenced by a judgment at the time of the Government's settlement with GasTech in March of 2002.

Dkt. # 85-4, at 1.  Payne retrospectively analyzed the value of the invoices in 1996, when the IRS originally seized the invoices, and 2002, when the United States settled its judgment against GasTech.  In 1996, Payne estimated that the fair market value of the invoices would have been $55,000 because, based on GasTech's financial condition, a fair return on the invoices would have been 10 to 25 percent of their face value.  Id. at 7.  By 2002, he found that GasTech's financial condition had improved slightly, and he opined that the invoices would be worth 25 to 40 percent of their face value.  Id. at 7.  The United States settled its claim against GasTech for $167,000, or approximately 54 % of the judgment against GasTech.  Process Pipe does not directly challenge the substance of Payne' affidavit, and it has not offered any expert testimony to rebut Payne's opinions.

Process Pipe's owner, James Lindsay, states that he is confident that he could have collected the full amount of the invoices in 1996 or shortly thereafter.  In his deposition, he stated that Process

---

[8]     Even without an objection by plaintiff, the Court would abuse its discretion if it entirely abandoned its gatekeeping function under Daubert.  Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003).  As a CPA with 25 years experience, Payne has served as a bankruptcy trustee, an expert witness in federal court, and as a receiver in state and federal court.  He has been qualified as an expert in over 100 cases to assist the trier of fact in determining damages, and he has published several articles on the topic of bankruptcy and the valuation of assets.  The Court finds that Payne is qualified , at least preliminarily, to give an expert opinion on the value of the seized invoices.

Pipe's "past history proves that [it] was able to collect all the money from GasTech for the last three years" prior to 1996. Dkt. # 88-2, at 17.  To support this statement, he asserts that Process Pipe was able to fully collect every invoice from GasTech from 1992 to 1995, but he acknowledged that he encountered a moderate level of resistance from GasTech during that time.  Id.  For the purposes of ruling on the government's motion for summary judgment, the Court must construe the facts in favor of Process Pipe, the non-moving party.  Lindsay's statement, taken as true, establishes that Process Pipe was able to collect all debts owed by GasTech from 1992 to 1995.  However, while Process Pipe may have had success collecting debts from GasTech before 1996, Lindsay's statement fails to address GasTech's declining financial state and the limited success other creditors were having with GasTech after 1996.  The United States has shown that many creditors, including the IRS, were not able to fully collect from GasTech after 1996, and Process Pipe has not refuted the government's evidence on this issue.  By itself, Lindsay's statement does not create a genuine issue of material fact showing that the seized invoices were worth their face value after 1996.

Process Pipe also claims that GasTech was receiving millions of dollars per year from 1996 to 1998, and it asserts that the IRS was sitting idly by while money passed through GasTech.  In support of this assertion, Process Pipe relies on GasTech's tax returns for 1996, 1997, and 1998.  During the 1996 tax year, GasTech reported gross receipts of $1,701,006 and it recorded a gross profit of $332,598.  However, GasTech had a net operating loss of $1,143,699 and its taxable income for 1996 was a loss of $1,066,011.  Dkt. # 86-13, at 1.  GasTech's earnings during 1997 improved, but its tax returns show that it was still not making a net profit.  For the 1997 tax year, GasTech claimed gross receipts of $8,540,662 and a gross profit of $1,804,473, but its taxable income was a loss of $161,173. Dkt. # 86-12, at 1.  GasTech's financial situation improved in 1998,

but not enough for GasTech to record a net profit.  During 1998, GasTech claimed gross receipts of $11,411,404 and a gross profit of $2,898,181, but its taxable income was still reported as a loss of $14,543.  Dkt. # 86-14, at 1.

The government responds that the amount of gross receipts and gross profits does not prove that GasTech had any funds to pay the seized invoices, and gives the following hypothetical:

> For example, a million dollars "passing through the hands" of an insolvent debtor with only $100 in assets would be of no comfort to creditors who are in line behind a first-place creditor secured by all of the debtor's assets to the tune of ten million dollars, indeed, the fair market value of their claims could easily be nil.  The fact that money "passed through GasTech's hands," does not in and of itself even begin to form a basis for contradicting the Government's valuation.

Dkt. # 89, at 6. The United States has submitted substantial evidence showing that GasTech had many creditors that were not being paid from 1996 to 1998.  The mere fact that GasTech had gross income during the taxable year does not show that GasTech could have fully paid the seized invoices, because Process Pipe has produced no evidence suggesting that GasTech could satisfy its current liabilities during that time.  Without additional evidence, tax returns establishing that GasTech earned gross income from 1996 to 1998 do not create a genuine issue of material fact showing that the seized assets could have been worth their face value.

Process Pipe argues that GasTech was paid in full for Process Pipe's work, and this supports a finding that GasTech could have paid the full amount of the invoices at some point.  However, it is not clear that Process Pipe has any evidence to show that GasTech was fully paid.  In its statement of undisputed facts, Process Pipe states that its attorney "informed [the IRS that] Defendant GasTech had been paid in full for work done by Plaintiff."  Dkt. # 86, at 4.  While it is true that Process Pipe's attorney called Schultz, the IRS agent working on its case, Schultz noted that she had no evidence to verify Process Pipe' statement.  Dkt. # 86-22, at 27.  Schultz did not dismiss Process Pipe's

21

assertion, but she contacted GasTech to determine if Process Pipe's allegations had any validity. GasTech denied that it had been paid for Process Pipe's work. Id. On March 21, 1997, Schultz was able to confirm that one GasTech Customer, NGPL, paid GasTech for work done by Process Pipe. Id. at 29. While this shows that at least one of GasTech's customers paid GasTech for Process Pipe's work, it is not clear how this refutes the government's analysis of the value of the invoices. There is no evidence of how much money GasTech received from NGPL, when GasTech was paid, or whether GasTech had sufficient funds on hand to pay the full amount of the invoices. However, the Court will consider this as evidence that GasTech received at least partial payment for Process Pipe's work.

Based on the evidence in the summary judgment record, the Court finds that the United States' settlement with GasTech for $167,000 represented a reasonable recovery under the circumstances, and it was unlikely that the United States could have collected the full amount of its judgment against GasTech. The undisputed evidence shows that GasTech was a financially troubled company that was settling much of its debt for a small percentage of its actual value. The government has submitted an expert affidavit to support its arguments, and the Court finds that this affidavit should be considered when ruling on the motions for summary judgment. Payne's affidavit, particularly his assessment of GasTech's financial condition in 1996, is consistent with actual evidence of GasTech's status during that time. The objective evidence shows that the United States was unlikely to receive full payment from GasTech with the invoices seized from Process Pipe. It was reasonable for the United States to conclude that it could recover more money from GasTech by offering to settle for less than the full amount of its judgment. See Cash v. United States, 961 F.2d 562, 569 (5th Cir. 1992) ("The IRS may generate more revenue at a lower cost by

22

simply collecting the easy paying accounts without expending the time and money to pursue the taxpayers' unwilling debtors.").

Process Pipe has not shown that the invoices were worth their face value or that it would have been able to recover more than $167,000.  As the burden would be on Process Pipe to prove the value of the seized assets at trial, it must produce sufficient evidence to show that a genuine dispute of material fact on this issue exists.  MacKenzie v. City and County of Denver, 414 F.3d 1266, 1273 (10th Cir. 2005).  Process Pipe has failed to do so and, given the substantial evidence submitted by the government to the contrary, the Court concludes that summary judgment in favor of defendant on this issue is appropriate.

## IV.

Both parties have moved for summary judgment on the issue of the reasonableness of the government's collection efforts.  Plaintiff argues that the risk of loss shifted to defendant when it levied on the invoices and failed to collect the invoices in a timely manner.  The government argues that it expended a significant amount of time and resources to collect as much as possible from the invoices, and there is no basis to conclude that its actions rose to the level of affirmative negligence.  In its opinion and order denying Process Pipe's motion for summary judgment (Dkt. # 64), the Court informed the parties that it would apply the following standard, based on Stead, in determining if the collection efforts were reasonable:

> A levy does not transfer ownership of property to the IRS unless it sells the property in a tax sale or disposes of the asset in some other way.  In order to [shift the risk of loss to the government], the IRS must attempt to collect on the levied property and engage in affirmative negligence that would justify shifting the risk of loss. . . . [This reasoning] protects the IRS from refund claims any time the taxpayer is unhappy with collection efforts, but does not absolutely immunize the IRS from acts of negligence in the collection process.  Stead strikes a reasonable balance between the

23

> interests of the parties, but still shows a proper deference to the IRS when it attempts to collect on levied property.

Dkt. # 64, at 8.  The parties have not objected to the Court's finding on this issue, and the Court will review plaintiff's claim under this standard.

Plaintiff's argument on this issue is complex and requires some explanation.  Plaintiff argues that Stead requires this Court to refer to Article 9 of the Uniform Commercial Code ("UCC") to determine whether the government's actions were reasonable.   See Stead, 419 F.3d at 948 (suggesting that remedies available to the IRS to collect on levied property are analogous to the remedies available to private creditors under the UCC).  Specifically, plaintiff cites section 9-201 of the UCC, which provides:

> (a) Except as otherwise provided in subsection (d), a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession.  In the case of chattel paper or an instrument, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

U.C.C. § 9-207(a) (2000).  Plaintiff claims that the "the undisputed material evidence herein demonstrates the absence of 'reasonable care' and that Defendant must bear the risk of non-collection of the Seized Assets, as a matter of law."  Dkt. # 86, at 11.  Analogizing the Court's mention of "affirmative" negligence to the common law concept of "active" negligence, plaintiff suggests that it must show that the government engaged in a "positive act or some breach of duty to act which is the equivalent of a positive act."  State ex rel. Oklahoma Bar Ass'n v. Borders, 777 P.2d 929, 932 n.9 (Okla. 1989).  Under the facts of this case, plaintiff states that it would be unfair to force the taxpayer to bear the risk of loss.  Plaintiff cites two cases that this Court has discussed at length in previous opinions and orders, United States v. Pittman, 449 F.2d 623 (7th Cir. 1971), and In re Barlows, Inc., 36 B.R. 826 (Bankr. E.D. Va. 1984).  However, plaintiff claims that the

24

instant case is strikingly similar to <u>Erlanger Citizens Bank v. Williams</u>, 151 S.W.2d 381 (Ky. Ct. App. 1941), which is a case discussing a creditor's common law duty to use reasonable efforts to enforce his rights in collateral in his possession.[9] <u>Id</u>. at 383.

Underlying plaintiff's argument concerning the risk of loss is its assertion that the IRS had three choices at the time it seized the GasTech invoices and failure to choose one of the options automatically shifted the risk of loss from plaintiff to the IRS:

> First, [the] IRS may elect to sell the property pursuant to IRC §§ 6331(b) and 6355. . . . Second, [the] IRS may elect to release the levy and return the property to the taxpayer pursuant to IRC § 6343. . . . Finally, [the] IRS may elect to retain the property or rights to the property. In effect, [the] IRS chose this third option but refuses to credit Plaintiff with the value of the assets it retained.

Dkt. # 88, at 7. Even if the Court were to assume that plaintiff's analysis is correct, plaintiff fails to address the well-accepted principle that the IRS has a significant amount of discretion when disposing of seized assets. <u>Stead</u>, 419 F.3d at 948 (issuance of tax levy, without more, does not create an affirmative duty for the IRS to take any action concerning the taxpayer's property); <u>United States v. Hahn</u>, 182 F.3d 919, *2 (6th Cir. 1999) (unpublished disposition) (IRS has no obligation to sell seized property); <u>Cash</u>, 961 F.2d at 567 (rejecting argument that the IRS has a duty to sell assets after a notice of levy has been served, and clarifying that statutory procedures apply once the IRS actually decides to sell the property). The statutes cited by Plaintiff explain how the IRS can

---

[9]     It is not clear how a case discussing a debtor's rights under Kentucky common law has any applicability to a statutory claim for a tax refund against the IRS. <u>Erlanger</u> imposes a standard of ordinary negligence, not affirmative or active negligence, on the holder of a note. <u>Erlanger</u>, 151 S.W.2d at 283. In addition, <u>Erlanger</u> has not been cited by any court for any reason, and the value of <u>Erlanger</u> as persuasive authority is doubtful. The Court has reviewed plaintiff's discussion of <u>Erlanger</u>, and finds that <u>Erlanger</u> is not applicable to plaintiff's claim for a tax refund.

dispose of assets after serving a notice of levy, but the statutes do not state that the IRS must act within a particular time frame or even take any action at all concerning a notice of levy.

In this case, the undisputed facts clearly show that when the IRS levied upon the invoices in 1996, GasTech was strongly considering bankruptcy to resolve its financial problems. GasTech hired an outside financial advisor who told GasTech to file for bankruptcy protection, but GasTech chose to restructure its debts outside of bankruptcy. However, plaintiff claims that the IRS was not aware of GasTech's financial condition in 1996, and it argues that the Court should not consider this when determining the reasonableness of the government's actions. Plaintiff's argument is not supported by the summary judgment record. On October 24, 1996, Schultz had a meeting GasTech's president, Khosrowyar, who informed her that GasTech was having cash flow problems. Dkt. # 86-22, at 21. After this meeting, Schultz agreed to delay any attempt to pursue a failure to honor levy lawsuit against GasTech, and established a payment plan on the invoices. In January 2007, Khosrowyar continued to assert that GasTech was unable to pay the invoices, and he denied statements made by Process Pipe's attorney suggesting that GasTech expected to receive up to $3 million in accounts payable that month. The evidence shows that the IRS was aware of GasTech's financial difficulties, even if it did not have the detailed information cited in the government's motion for summary judgment. The Court will consider the evidence cited by the government concerning GasTech's unstable financial condition when it considers whether the government's collection efforts were reasonable under the circumstances.

As the government notes in its motion for summary judgment, the Court's previous opinions and orders in this case suggest that the value of the invoices and the reasonableness of the government's collection efforts intersect, and many of the same facts and legal arguments are

applicable to both issues.  In this case, the government had a reasonable fear that attempting to collect the full amount of the invoices with a premature lawsuit would potentially drive GasTech into bankruptcy.  Process Pipe does not directly refute the government's allegations that GasTech was facing severe financial difficulties, but Process Pipe does argue that millions of dollars were flowing through GasTech between 1996 and 1998.  However, the amount of money flowing through GasTech is immaterial without some evidence proving what GasTech's financial obligations were during that time.[10]  When the United States filed a failure to honor levy suit against GasTech in 1999, one of GasTech's defenses was that it was financially unable to satisfy the levy.  The evidence in the summary judgment record clearly shows that GasTech was settling its debts for pennies on the dollar in 1996, and there is no evidence suggesting that the United States, in its capacity as a creditor, would have fared any better.  In fact the United States improved it chances of collecting on the levies by settling, because it obtained a subordination agreement from one of GasTech's creditors as part of the settlement.

Process Pipe has not shown that it was unreasonable for the United States to delay in filing a lawsuit against GasTech until 1999.  By establishing a payment plan, the IRS ensured that it would collect at least part of the invoices.  As the court noted in Cash, there are cases when the "IRS may generate more revenue at a lower cost by simply collecting the easy paying accounts without expending the time and money to pursue the taxpayer's unwilling debtors."  Cash, 961 F.2d at 569. The undisputed evidence shows that in 1996 the invoices were worth far less than their face value,

---

[10]     The undisputed facts show that Process Pipe expected to receive over $1 million dollars in accounts receivable in 1996, yet Process Pipe stated that it was unable to pay a tax deficiency of $354,520.  Dkt. # 85-6, at 9-10.  As Process Pipe's own situation shows, the amount of money coming into a company is not always a reliable indicator of the company's ability to pay its debts.

and the IRS could reasonably have concluded that it would not have been worthwhile to file an expensive lawsuit with the prospect of a minimal return.  Relying on Payne's affidavit, it appears that delaying the filing of lawsuit enabled the IRS to collect more money from GasTech than if the government had precipitously pursued a claim against GasTech.

Process Pipe asserts that the IRS should have immediately returned the invoices to Process Pipe when it decided not to file a failure to levy suit against GasTech in 1996.  However, Process Pipe has not shown that the United States had an obligation to return the invoices or that it was negligent for the IRS to retain control of the invoices.  In fact, there is no evidence that Process Pipe asked for the IRS to return the invoices.  On October 31, 1996, Process Pipe told Schultz that it had considered asking for payment of the invoices directly from GasTech's vendors, but it does not appear that Process Pipe followed up on this.  The taxpayer, Process Pipe, failed to exercise its right to request return of the seized of the invoices pursuant to 26 U.S.C. § 6343, and the Court will not penalize the government for Process Pipe's failure to act.  In any event, the Court is not in a position to second-guess the IRS' decision to retain control of the invoices, because the IRS' decisions concerning enforcement of a tax levy are entitled to a substantial amount of discretion.  See Christopher Cross, Inc. v. United States, 461 F.3d 610,  613 (5th Cir. 2006); Orum v. C.I.R., 412 F.3d 819, 820 (7th Cir. 2005).

Process Pipe has not carried its burden to show that the risk of loss should be placed with the United States and, contrary to Process Pipe's assertion, the United States did not commit affirmative acts of negligence or fail to act in this case.  Plaintiff cites two cases, Pittman and Barlows, where courts have placed the risk of loss with the IRS but, in an earlier opinion and order, this Court discussed those cases at length and found they did not support plaintiff's claim for a tax refund.  Dkt.

28

# 64, at 6-9 (finding that plaintiff was not entitled to summary judgment under <u>Pittman</u> and <u>Barlows</u>, because those cases were "distinguishable based on the unique facts of those cases").  The Court will not revisit that finding in this Opinion and Order, as plaintiff has not provided any new argument on the applicability of those cases.  Even if Process Pipe did not approve of the IRS' methods, the government invested a substantial amount of time to enforce its levy against GasTech, and the United States did file a lawsuit against GasTech to enforce the levy in 1999.  The United States collected $167,000 from GasTech and, based on the undisputed evidence before the Court, this amount represented a substantial recovery from a financially unstable corporation.  There is no evidence that the United States committed affirmative negligence when it enforced its levy against GasTech, and summary judgment in favor of the United States should be entered on this issue.

## V.

The Court finds that there are no genuine issues of material fact precluding the entry of summary judgment.  The United States has shown that the seized invoices were not worth their face value and that its collection efforts were reasonable.  Based on these findings, the Court finds that the government's motion for summary judgment should be granted, and plaintiff's motion for summary judgment should be denied.  These issues are both essential elements of plaintiff's claim for a tax refund and, with these issues resolved against Process Pipe, there is no possibility that plaintiff can prevail on its claim for a tax refund.

**IT IS THEREFORE ORDERED** that the United States' Second Motion for Summary Judgment and Opening Brief in Support (Dkt. # 85) is **granted**, and Plaintiff's Second Motion for Summary Judgment and Opening Brief in Support (Dkt. # 86) is **denied**.  A separate judgment is entered herewith.

**DATED** this 14th day of June, 2007.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE